# UNITED STATES DISTRICT COURT

# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CASE NO.: 7:21 CR 441 (KMK) |
| PLAINTIFF | : | |
| | : | |
| v. | : | |
| | : | |
| PATRICK CHELLEL, | : | |
| DEFENDANT | : | July 15, 2024 |

# AMENDED SENTENCING MEMORANDUM SUBMITTED ON BEHALF OF DEFENDANT PATRICK CHELLEL

Bruce D. Koffsky
KOFFSKY & FELSEN, LLC
1261 Post Road, Suite 202B
Fairfield, CT  06824
(203) 327-1500

*Attorney for Defendant*
*Patrick Chellel*

LAW OFFICES OF
**KOFFSKY & FELSEN, LLC**
1261 Post Road, Suite 202B
Fairfield, CT 06824
(203) 327-1500
Facsimile (203) 327-7660

July 15, 2024

**Via ECF/email**

The Honorable Kenneth M. Karas
United States District Judge
Southern District of New York
300 Quarropas Street
White Plains, NY 10601

Re:   United States v. Patrick Chellel
        7:21 CR 441 (KMK)

Dear Judge Karas:

      This amended sentencing letter and its attachments are submitted on behalf of Patrick Chellel, who is scheduled to be sentenced on July 22, 2024. It is hoped that the undersigned is articulate enough to identify and document the defendant's individual characteristics for the Court's consideration so as to assist the Court in determining a sentence that is appropriately tailored to serve both the interests of justice and the sentencing goals of 18 U.S.C.§ 3553(c). As will be more fully discussed below, Mr. Chellel's unique set of circumstances warrant a non-guideline sentence. Mr. Chellel respectfully requests that the Court impose a sentence of **1 day** on Counts 2 and 6 of the Superseding Indictment and to further impose a sentence of **60 months**, which by statute, is to run consecutively with the aforesaid sentence on Count 7. Such a sentence, considering this specific individual, would be sufficient, but no greater than necessary to achieve the purposes of sentencing.

**BACKGROUND**

      On or about July 14, 2021, the government filed an Indictment charging seven individuals with their participation in Hobbs Act Robbery (and Conspiracy to Commit Hobbs Act Robbery), Violence in Furtherance of Hobbs Act Robbery and Firearms offenses stemming from their robbing individuals at gunpoint in the hopes of stealing the proceeds of a drug trafficking operation. On March 23, 2022, defendant Patrick Chellel was arrested and named in a Superseding Indictment which charged Mr. Chellel together with the other seven defendants with the above offenses and added a count of Marijuana Trafficking Conspiracy against Mr. Chellel. On the date of his initial presentment, Mr. Chellel was ordered detained, and he has remained incarcerated since that date.

On August 10, 2023, Mr. Chellel pled guilty before the Honorable Magistrate Andrew E. Krause to Counts Two, Six and Seven of the Superseding Indictment. Mr. Chellel's stipulated Sentencing Guideline calculation is delineated at length in the plea agreement between the government and the defendant which is dated July 19, 2023. The defendant's Sentencing Guideline calculation is also outlined in the Presentence Report. (See Presentence Investigation Report, Paragraphs ¶¶ 44 - 77.) Based on the complicated and convoluted mathematics employed by the United States Sentencing Commission, Mr. Chellel's advisory Guideline range as laid-out in the Plea Agreement on Count Two and Six is 151 to 188 months' imprisonment and on Count Seven, a mandatory minimum term of **60 months'** imprisonment, which is to run consecutively with Counts Two and Six.

As will be more specifically identified below, the defendant noted his objection to the probation officer's scoring of the defendant's Criminal History Category as a result of the newly enacted Amendment 821. The defendant also submits that the Court should review his criminal history and find that the one point the defendant receives for his conviction for the New York offense of Driving While Ability Impaired, a violation and not a crime, is de-minimis and, as such, the Court should reclassify the defendant as being in Criminal History Category I.

It is Mr. Chellel's further request that the Court impose a non-guideline sentence by determining that in Mr. Chellel's specific situation, after reviewing his individual characteristics and personal history, that a variance from the sentencing guidelines is appropriate.[1] In considering Mr. Chellel's particular situation, the conditions of his confinement, the sentences this Court has meted out in this case and others for "similarly situated" defendants, and the fact that he has never been detained in any prior criminal matter for more than 24 hours, that a sentence of One day to serve on Counts Two and Six plus **60 consecutive months** imprisonment on Count Seven, is sufficient, but no more than necessary to satisfy the directives of 18 U.S.C. § 3553(a).

Mr. Chellel now stands ready for sentencing.

## PERSONAL HISTORY AND CHARACTERISTICS

### A. Personal History

---

[1] A court may impose a sentence outside the properly calculated sentencing guideline range through either a departure or a variance. A "departure" is typically a change from the final sentencing range computed by examining the provisions of the Guidelines themselves. It is frequently triggered by a prosecution request to reward cooperation . . . or by other factors that take the case "outside the heartland" contemplated by the Sentencing Commission when it drafted the Guidelines for a typical offense. A "variance," by contrast, occurs when a judge imposes a sentence above or below the otherwise properly calculated final sentencing range based on application of the other statutory factors in 18 U.S.C. § 3553(a). See U.S. Sentencing Commission, Departure and Variance Primer, June 2013 (http://www.ussc.gov/sites/default/files/pdf/training/primers/Primer_Departure_and_Variance.pdf ).

Much of Patrick Chellel's life has been described in detail in Probation Officer Deanna Paige's well-written presentence report and rather than repeating Officer Paige's narrative, I will supplement only those areas which will provide a basis for Mr. Chellel's sentencing request.

It is certainly clear that Patrick Chellel stands before the Court without the often-heard backstory of poverty, trauma, and lack of youthful guidance. Although there were times that he can remember when money was tight, there were no instances of having to move into a shelter or times when one or both parents abandoned the family or were incarcerated. There was no significant drug abuse or alcoholism in the household and Mr. Chellel could not identify a single violent incident perpetrated by a loved one. Mr. Chellel had the good fortune of living with both his working parents, with being an average student who had the benefit of not only an intellect but being good at sports and having an engaging personality. When asked about early memories of trauma, Mr. Chellel cannot recall one until the death high school friend from a car accident. There was of course a more recent trauma, Mr. Chellel's best friend was murdered as a result of a marijuana-proceeds' robbery in 2019, whose perpetrators went unknown and unapprehend until just months ago.

Drug use did come early for Mr. Chellel. He recalls first using marijuana when he was just 11-years old and by the time he was through adolescence, he was smoking upwards of 10 blunts a day. Marijuana use gave way to marijuana dealing and there came a point, when he wasn't employed or working one of the two businesses he built from scratch, that Mr. Chellel financially supported himself by dealing in large quantities of weed. Then there were the robberies that Mr. Chellel stands convicted of participating in.

The robberies that Mr. Chellel played a part in, had a leadership role in - when asked for an explanation as to why, Mr. Chellel simply puts his head down and covers his face with his hands and starts to shake his head from side to side as if he doesn't understand why either. In reviewing the letters that have been collected in support of Mr. Chellel, it's obvious that he has let his parents down, his friends and neighbors down and his paramour and children down.

But there's more to the story of Mr. Chellel's involvement than just letting down his loved ones; there is also the fact that Mr. Chellel's co-defendants were not satisfied with the people he identified as worthwhile targets. When these co-defendants did not receive information from Mr. Chellel as to other lucrative victims, they turned on Mr. Chellel and robbed him at gunpoint. On February 19, 2020, there was a home invasion in Montgomery, New York. Gunman entered a home and bound three individuals with duct-tape and stole marihuana, U.S. Currency and other valuables. Patrick Chellel was one of those gunpoint robbery victims. His efforts to assist law enforcement are documented in a criminal complaint, See Docket Number 7:20cr517 (VB), where Mr. Chellel is listed as "Victim 1."

That was then, this is now.

4

Patrick Chellel has spent the last 27 months[2] locked up but he has not been sitting idle. Mr. Chellel has held down three jobs while at MDC-Brooklyn; kitchen cleaning staff, food preparation and orderly. Although further shackled by the post-pandemic catastrophe that is MDC-Brooklyn, Mr. Chellel has participated in the following programs (Attached as Exhibit A):

"Know Better, Live Better (Valhalla)
Conflict Resolution
Leadership & Influence
Sales Fundamentals
Time Management
Basic Bookkeeping
Ten Soft Skills
Entrepreneurship
Business Ethics
Budget & Financial Reports
Time Management
Business Acumen
Developing Creativity
Foundations of Leadership
CDL Prep Class

The program that Mr. Chellel is most proud of is his participation in the "Suicide Watch Companion" program. While not a lengthy course of study, only 4 hours of training, Mr. Chellel has participated for months in the Suicide Watch Companion program which is just what the name implies: Mr. Chellel is partnered with another individual and together they watch an inmate who has expressed suicidal ideation or has shown the possibility of self-harm. Could there be any other responsibility more emblematic of the regard with which Mr. Chellel is held by the facility than employing him to keep a close and careful watch of a federal inmate in distress. Mr. Chellel has received a Certificate of Excellence with regards to his participation in the S.W.C. program which reads "For your service…and your display of diligence and dedication…."

Mr. Chellel has drafted letters for the Court's consideration, and they are attached hereto as Exhibit B.

**B. Personal Characteristics as Described in Letters of Support**

Since one of the factors that the Court is directed to consider in applying 18 U.S.C. § 3553(a) is the history and characteristics of the defendant, a review of the letters collected in support of Patrick Chellel are offered to illustrate the type of person he is. See Attached as Exhibit C.

---

[2] This is Mr. Chellel's first incarceration as he has never spent more than 24-hours detained and that was only in a local police department's lock-up.

- **Jessica Guevara** (Longtime Girlfriend)
    - "Throughout our relationship, I have come to know Patrick as a deeply compassionate, hardworking, and determined individual."
    - "Patrick is an amazing father to our two wonderful children,"
    - "The distance that has kept our family apart has not prevented Patrick from contributing with emotional support for his kids, ensuring they feel loved and secure."
    - "Patrick's work ethic is admirable."
    - "I recognized his strong will to work hard in order to make his dreams come true."
    - "Patrick has always prioritized the well-being and future of his children and loved ones."
    - "Patrick is a kind and respectful individual who has gone out of his way to assist those in need, despite his busy schedule. He constantly demonstrates compassion and generosity"
    - "His innate ability to connect with others and his willingness to make a positive impact made him a very likeable man."
    - "Patrick is determined to use this experience as an opportunity for growth and transformation."

- **Marco Guevara** (Brother-in-Law)
    - "Throughout the years, I have witnessed Patrick exhibit qualities of honesty, integrity and responsibility."
    - "I firmly believe that Patrick is genuinely remorseful for any mistakes he may have made,"

- **Jose Guevara** (Father-in-Law)
    - "I must admit that as a father myself, it is heartbreaking to have to deal with the fact that his children are suffering the consequences of his mistakes."
    - "My perspective of who Patrick is as a man has not changed based on a moment of poor judgement. Time after time Patrick has demonstrated his true nature of a loving family man who would never do anything to intentionally cause harm to anyone."

- **Sandra Glover** (Family Friend)
    - "I knew right away that Patrick was an exceptional young man."
    - "He has taught my grandson how to become a giver and to strive to be productive in society."
    - "Patrick has played a major role in feeding the homeless at Saint Margaret Soup Kitchen, as well as donating Food to the Honor's Homeless Shelter. Patrick Chellel's giving has always been limitless."

- **Ralph Chellel** (Father)
    - "I have watched him grow and develop into the remarkable individual he is today"
    - "Leadership skills that continue to define him today."
    - "In his mind family and friends ae everything. He goes above and beyond to help… He created a name for himself as the guy you can call when you need a helping hand."
    - "Now, he has a family of his own but his unwavering loyalty to the wrong people in his life has brought him before you today."
    - "Patrick is not just a case number; he is a loving father, son, and a fundamentally good person who finds himself in a difficult situation."

- **Patricia Chellel** (Mother)
    - "He is filled with remorse for the damage this has done to us all."
    - "Patrick's biggest worry is the loss of time with his two young children…It is his biggest regret."
    - "Even some corrections officers at MDC have made it a point to tell me that he was 'one of the good ones.'"
    - "His earnest desire to make amends for any damage he has caused and his regret his actions."

- **Amerie Chellel** (Sister)
    - "I believe in his ability to learn from his experiences and emerge as an even more extraordinary individual."
    - "Despite facing challenges due to his trusting nature, he has always remained steadfast in the notion that people are inherently good."

- **Kimberly Johnson** (Family Friend)
    - "I can wholeheartedly vouch for his impeccable character."
    - "Pat is loved by all and has many genuine friendships."
    - "I affirm that Patrick is a hard-working, honorable, productive and valuable member of society."

- **Nilda Rosado** (Family Friend)
    - "Patrick is a very responsible man who prioritizes his parents and children."
    - "It is tough for me to comprehend that Patrick committed the crimes he is accused of."

- **Ralph Chellel Jr**. (Brother)
    - "At his core, he's always been the same: Innately good. I don't say that lightly."
    - "He never cared what people thought of him and he always did the right thing no matter what."

- o "No matter how badly I treated him or how upset I made him he always maintained that good heart. As I look back, I wish I had appreciated him more. I wish that little kid knew that my jealousy stemmed from admiration of his personality. Maybe then, Patrick wouldn't have had to seek brotherhood elsewhere, in places and people that also didn't appreciate him."
- o "Even though I'm older, I look up to him. I feel he has always been a better person than me."
- o "His biggest fault is seeing the best in the worst people. He always give people the benefit of the doubt even when these people have done wrong by him. I never liked any of his friends and was sure to tell him, but he always seemed to see in them what most people could not. Unfortunately, that good nature led him down this path and has him in front of you today."
- o "My brother has made a mistake and has confided in me multiple times about how heavy it weighs on him."

- **Rylee Eterginoso** (Friend)
  - o "He is the epitome of thoughtfulness and has always come across to me as responsible, charitable, and sincere."

- **Joanna Gallo** (Friend)
  - o "I firmly believe that Patrick is remorseful for his actions and is committed to making amends. He recognizes the impact of his mistake and is determined to learn from it, showing a genuine desire to become a better person."

- **Meagan Kalmaras** (Cousin)
  - o "When it comes to writing about Patrick's character, I have nothing but good things to speak, and not just to seek empathy for his wrongdoings, but the fact that I know deep down Patrick is a good person with a good heart."

- **Kyrie Burns** (Cousin)
  - o "[He] is a family person who has presented himself with being honest, dependable and levelheaded."

- **Faythe DeFazio** (Aunt)
  - o "He has many cousins, nieces and nephews who adore him because of his gentle good nature."

- **Leah Burns** (Aunt)
  - o "I have known Pat always to be kind and thinking of others,"

- **Caryn Carper** (Cousin)
  - o "I was taken aback, surprised that the cousin I know, and love has been involved in the things stated in his case."

- o "He is a kind, loving, and generous man… He is much more than any mistakes he may have made."

- **Cynthia Burns** (Cousin)
    - o "I have always been proud of my cousin Patrick and the man he has become."

- **Linda Loop** (Family Friend)
    - o "I have witnessed Patrick grow into a smart, responsible family-focused man of integrity. Through the years I have known him, I have held him in the highest regard."

- **Nancy Romeo** (Family Friend)
    - o "Patrick is hardworking, caring and the most selfless individual I have [had] the privilege to have in my life."

- **Jean Archebald** (Neighbor)
    - o "Pat has been a good neighbor and friend"

- **Aaron Etra** (Inmate and Friend)
    - o "He greeted me when I arrived and has been an unfailing source of personal and general assistance, knowledge and advice."
    - o "I can vouch for the respect in which he is held by his fellow inmates and the other orderlies. We know we can turn to him for needed information and support which he provides generously and graciously."
    - o "His good character comes through daily, and we all benefit from his calm demeanor and ability to deal with all that arises here."

- **Trenton Judkins** (Inmate and Friend)
    - o "A fellow rule abiding and role model of a detainee here at the Metropolitan Detention Center…"
    - o "Not only is Patrick a model inmate, but he is also a genuine and kind-hearted man who has nothing, but the best of interest for anybody he encounters."
    - o "One of the most well-mannered and one of the most amazingly souled individuals I have ever had the pleasure of meeting."
    - o "He also allowed his fatherly instincts to shine through by taking me under his wing as if I was one of his very own."
    - o "Often times even the best of people can fall off of the right track momentarily and during said period, they can make a life altering decision that will haunt them for the remainder of their lives, this being the case for Parick."
    - o "Patrick is good hearted man who made a mistake that I am asking you not let define him on the day of sentencing,"
    - o "If anybody in this entire world qualifies or deserves a second chance at life, it would be the man state stands before you at the very time you read this letter"

- o "I am asking that you take a leap of faith and trust when I say that Patrick is one of the most well intentioned and solid people, I have ever had the blessing or an opportunity, of getting to known a personal level."
- o "Because sometimes all somebody needs is a little support, faith and a second chance at life."

## ARGUMENT

### a. OBJECTIONS TO THE PRESENTENCE REPORT

On April 10, 2024, the undersigned mailed the following to the probation officer assigned to write the Presentence Report for the defendant:

"I write to you today to request an update to the Presentence Report that you prepared for the Court on my client, Patrick Chellel. As you may remember, on October 25, 2023, when the last report was filed (Docket Entry 249), Mr. Chellel had two points for two criminal convictions plus two "status points" which placed him in Criminal History Category III. As you know, previously under U.S.S.G. § 4A1.1, a defendant who committed the "instant offense while under any criminal justice sentence, including probation, parole, supervised release, imprisonment, work release, or escape status," received two additional criminal history points, commonly known as "status points." Amendment 821 of the Sentencing Guidelines recently amended Section 4A1.1 to eliminate such status points for any defendant who has six or fewer criminal history points. Pursuant to Amendment 821, Mr. Chellel now has two Criminal History Points and is in Criminal History Category II."

The undersigned requested that the Presentence Report be amended to reflect a change in the defendant's criminal history scoring and his final Criminal History Level. Although no updated Presentence Report has been filed, the defendant respectfully requests that the Court find that the above is a correct reading of the current U.S. Sentencing Guidelines and further that, based on Amendment 821, the defendant has only two criminal history points and is therefore, in Criminal History Category I.

### b. ARGUMENT AS TO THE DEFENDANT'S CRIMINAL HISTORY

On June 16, 2012, 9 years and 9 months prior to his arrest in the instant case, Mr. Chellel was stopped while driving a motor vehicle and later charged with a New York motor vehicle offense. Five (5) days after he was charged, Mr. Chellel resolved that matter with a guilty plea to Driving While Ability Impaired, in violation of New York Vehicle and Traffic Law sec. 1192.1. Mr. Chellel paid a $500 fine, and his New York Driving privileges were suspended for 90 days. The Presentence Report identifies that offense as a One (1) point conviction for Criminal History calculations. (See Presentence Report, ¶ 73). The defendant submits that he should not receive any criminal history points for this conviction, which is an "infraction" - or in the alternative, that the Court finds that the point that the defendant received for this prior conviction over represents his

criminal history.[3] In either case, the defendant requests that the Court find that the defendant is in Criminal History Level I.

Chapter 4, Part A of the Guidelines governs calculation of a defendant's criminal history score. Criminal history points are accumulated when prior sentences meet qualifying criteria but do not also satisfy exclusionary criteria. United States v. Potes-Castillo, 63 8 F .3d 106, 109 (2d Cir. 2011). Guidelines§ 4Al .2(c)-which addresses those prior sentences that "are counted" towards, and "excluded" from, a criminal history score-classifies all prior convictions into three groups: (1) sentences that "are counted", (2) sentences that "are counted" subject to possible exception, and (3) sentences that are "never counted".

Under Guidelines§ 4Al.2(c), only prior felonies fall into the group of sentences that are always "counted". The second group of sentences-those counted unless excepted-includes the misdemeanor and petty offenses listed in § 4A1.2(c)(1) "and offenses similar to them, by whatever name they are known," if: "(A) the sentence was a term of probation of more than one year or a term of imprisonment of at least thirty days, or (B) the prior offense was similar to the instant offense". U.S.S.G. § 4Al.2(c)(l). The final group of sentences-those that are "never counted"-includes all minor offenses listed in § 4A1.2(c)(2) "and offenses similar to them, by whatever name they are known." This latter category of sentences-i.e., those that never count towards a defendant's criminal history score-include sentences imposed for"[p]ublic intoxication","[m]inor traffic infractions","[l]oitering", and other similar offenses.

It would stand to reason then, that a conviction for the infraction of Driving While Ability Impaired is one of those "minor" traffic infractions. Unfortunately, both Application Note 5 to Guidelines § 4Al.2, and the holdings of this Circuit deem it countable. *See* U.S. v. Potes-Castillo, 638 F.3d 114 (2d Cir. 2011).

Nonetheless, the now almost Twelve (12) year old conviction is for an "infraction," not a crime, and was resolved with a $500 fine some 5 days after Mr. Chellel was charged. The perceived seriousness of the offense as indicated by this level of punishment weighs in favor of concluding that this criminal history point, which moves Mr. Chellel from Criminal History Category I to Criminal History Category II overstates the seriousness of Mr. Chellel's criminal record. For the above reasons, the defendant requests that the Court find that the defendant is in Criminal History Level I.

   c. **A "NON-GUIDELINE" SENTENCE IS APPROPRIATE GIVEN THE NEED TO AVOID UNWARRANTED SENTENCE DISPARITIES AMONG DEFENDANTS WITH SIMILAR RECORDS WHO HAVE BEEN FOUND GUILTY OF SIMILAR CONDUCT**

---

[3] See USSG §4A1.3. [A downward departure may be authorized if a defendant's criminal history overstates the seriousness of his or her criminal record or the likelihood that the defendant will commit other crimes.]

In the section entitled "Introduction and General Application Principles" of the United States Sentencing Guideline Manual, the "Policy Statement" provides that "Congress sought reasonable uniformity in sentencing by narrowing the wide disparity in sentences imposed by different federal courts for similar criminal conduct by similar offenders…Congress sought proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of different severity."(See Part A – Introduction and Authority, Federal Sentencing Guideline Manual, 2023 Edition.) The defendant submits that sentencing him to a guideline sentence would be neither uniform nor proportional to those sentences meted out, certainly to the co-defendants in this present indictment.

The defendant would of course point to the other defendants in this very case.

Defendant Dorian Byrd pleaded guilty to Count 3 of the Indictment and received a sentence of 84 months which was to run consecutively with indictment 20cr517 (VB).

Defendant Robert Ojeda pleaded guilty to Count 4 of the Indictment and received a sentence of 66 months.

Defendant Darren Lindsay pleaded guilty to Counts 6 and 7 of the Superseding Indictment and was sentenced to 66 months to run consecutively to an 84-month sentence.

Defendant Antoine Koen has pleaded guilty to Counts 4 and 6 of the Superseding Indictment but has yet to be sentenced.

The government might argue that Patrick Chellel's sentencing should be in line with the sentences meted-out by the Court to Mr. Byrd, Mr. Lindsay and Mr. Koen; a simple review of the government's sentencing submissions for each of those defendants clearly differentiates Mr. Chellel from those individuals. They are not "similar offenders."

The government's sentencing submission in Darren Lindsay identifies Mr. Lindsay's three prior convictions, "including two drug felonies in 2013 and 2015. The defendant has twice served significant, three-year terms of incarceration for serious criminal conduct, and his history under supervision has been poor. In 2013, the defendant was sentenced to three years' imprisonment for Criminal Possession of a Controlled Substance in the Third Degree: Narcotic Drug with Intent to Sell, in violation of New York Penal Law ("NYPL") Section 220.16(01). (PSR ¶ 55.) In 2015, while on parole for his prior drug felony conviction, the defendant was arrested, charged, and convicted of his second felony—Criminal Possession of a Controlled Substance/Narcotic, in violation of NYPL Section 220.16(12). (PSR ¶ 57.) The defendant was sentenced to another term of three years' imprisonment, and his existing parole was revoked. (PSR ¶¶ 55, 57.) Indeed, the defendant was on parole during the first robbery charged in the Superseding Indictment (Counts Two and Three)."

The government's sentencing submission in Dorian Byrd is equally revealing in differentiating Mr. Chellel from the other defendants' sentences. For Mr. Byrd, the government identifies three prior convictions in South Carolina, his similar violent conduct, and a conviction for conspiracy to furnish contraband into a prison.

12

Finally, in the case of Mr. Antoine Koen, the government's sentencing submission identifies this defendant's "five criminal convictions, including one for a violent assault he committed while in custody for this case. He has previously served a significant, two-year sentence, and has a lengthy history of disciplinary infractions that include violent conduct and fighting on multiple occasions. (PSR ¶ 70.) His track record while on parole fares no better, with the Probation Office noting that he absconded from supervision and had a parole revocation after another arrest in 2015. (Id.) Additionally, as illustrated above, despite his prior convictions, the defendant had no qualms accumulating multiple pictures on his phone showing him posing with firearms and displaying his ready access to weapons." The government did not want to fail to identify Mr. Koen's conduct after being detained in the instant case, "the defendant's conduct while detained in this case provides additional aggravating factors that underscore the need to protect the public. Less than two months after he was arrested in this case, the defendant punched another inmate in Westchester County Jail following a confrontation over whose turn it was to use the telephone. The defendant was later charged with second degree assault and pled guilty in Westchester County Court, where he is awaiting sentencing."

What differentiates Mr. Chellel from these sentenced individuals? Mr. Chellel has no history of violence other than the instant case. Mr. Chellel has never before served more than an overnight in a penal institution. Mr. Chellel's behavior at Valhalla Correctional and then at MDC-Brooklyn has been exemplary. As identified in the presentence report, Mr. Chellel has not a single disciplinary report and has participated in a myriad of programs while detained. (See ¶ 13.) Mr. Chellel is not a "similar offender" to these individuals already sentenced (and to be sentenced) in this case, not by a mile. As such, the sentences issued to Mr. Lindsay, Mr. Byrd and, in the abstract, Mr. Koen should not be relied upon by the court as the bar to which Mr. Chellel must be judged.

d. **CONDITIONS OF CONFINEMENT**

What more can be said about the conditions of confinement at MDC during the time of Mr. Chellel's confinement. That the conditions are straight out of a Dicken's novel? That MDC-Brooklyn has become a barbaric third-world gulag, a festering sore in the side of the BOP? That MDC-Brooklyn is the poster-child for an Eight Amendment violation?

Such rhetoric might be passed off as the ravings of an over-passionate defense counsel except that such statements have been mirrored in the writings of eminent jurists in this very District, such as "[I]t is the finding of this Court that the conditions to which [the defendant] was subjected are as disgusting, inhuman as anything I've heard about in any Colombian prison, but more so because we're supposed to be better than that. . . . I think you've suffered triply as a result . . . . I am convinced that no good would be served by keeping you incarcerated for one minute more than I am required to do by law." United States v. Days, No. 19-CR-619 (CM) (S.D.N.Y. Apr. 29, 2021), or Judge Berman's description of MDC being "dirty," "infested with drugs" and the ability of inmates to get "drugs and other contraband at the drop of a hat"[4] and Judge Furman's recent decision in U.S. v. Chavez, 1:22cr303 (JMF) wherein he writes about the power outage in

---

[4] United States v. Morgan, No. 19-CR-209 (RMB) (S.D.N.Y. May, 5, 2020), ECF No. 90.

13

the winter of 2019 which "left inmates without light or heat for a full week while a polar vortex swept the East Coast" and where inmates of MDC-Brooklyn suffer "near perpetual lockdowns (no longer explained by COVID-19), dreadful conditions, and lengthy delays in getting medical care," and where "at least four inmates have died by suicide in the past three years." [See Docket Entry 32, filed January 4, 2024.] Judge Furman wrote that the staffing levels are so bad that the jail is in a state of "near-perpetual lockdown," with detainees locked in their cells for at least 22 hours a day, with no access to visitors, phone calls, showers, classes or exercise.

Patrick Chellel has suffered as an inmate at MDC-Brooklyn, as have all the rest of the men detained. He has suffered through lockdown after lockdown, the diminution and cancellation of visits, suffered during water shut offs, suffered by being served food with mold and maggots, suffered as the result of no sanitary provisions, suffered as a result of no heat or hot water in the winter and no air conditioning in the summer, suffered as a result of no computer access and no telephone service. Mostly, Patrick Chellel has suffered as a result of his attempt at living a laudable existence in a hellish environment where there are insufficient staff members to protect inmates such as him, from the marauding mobs of less caring individuals.

Patrick Chellel submits that the Court should determine that Mr. Chellel deserves considerable credit for accomplishing what he has in circumstances such as these.

**THE APPROPRIATE SENTENCE**

A District Court should normally begin all sentencing proceedings by calculating, with the assistance of the Presentence Report, the applicable Guideline Range. Gall v. United States, 128 S. Ct. 586, 596 (2007). The Guidelines provide the "starting point and the initial benchmark" for sentencing, Gall, 128 S. Ct at 596, and the District Courts must "remain cognizant of them throughout the sentencing process." Id, at 596 n.6. Now, however, it is clear that the Guidelines are guidelines – that is, they are truly advisory. United States v. Cavera, 550 F.3d 180 (2d Cir. 2008). "A District court may not presume that a Guideline sentence is reasonable, it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense. District Judges are, as a result, generally free to impose sentences outside the recommended range." Id. Once again, District judges may exercise discretion in fitting sentences to a defendant's individual characteristics. United States v. Crosby, 397 F.3d 103, 114 (2d Cir. 2005).

In exercising this discretion, judges are guided by 18 U.S.C. § 3553(a), which directs them to impose a sentence that is "sufficient, but not greater than necessary" to, among other considerations, "reflect the seriousness of the offense, . . . promote respect for the law, and provide just punishment for the offense," and to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2). The statute also directs courts to consider, among other things, "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), as well as "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

As for the sentence of Mr. Chellel, the U.S. Supreme Court made abundantly clear, in imposing sentences on one count of conviction, a court is permitted to consider the sentences imposed on other counts. Dean v. United States, 581 U.S. 62 (2017). Mr. Chellel will be incarcerated, at a minimum, for at least **60 months**. He has been incarcerated since just after his 31st birthday and if the Court were to agree with the defendant's sentencing proposal, he will not be released until just after his 37th. Is still more incarceration necessary to protect the public; will 60 months not afford adequate deterrence? This for an individual who, as has been said previously, never served more than a 24-hour period behind bars. This, for an individual who has no prior crimes of violence and was in fact, a victim of the identical violence that he participated in.

Patrick Chellel suggests that the mandatory minimum sentence of **60 months** together with a sentence of 1 day will satisfy the sentencing concerns of 18 U.S.C. 3553(a). We ask the Court to so find.

## **CONCLUSION**

Mr. Chellel respectfully requests that the Court impose a sentence of 1 day on Count 2 and Count 6, a sentence of **60 months** on Count 7, which by statute, is to run consecutively with the aforesaid sentence. Patrick Chellel submits that such a sentence will adequately achieve the purposes of sentencing and would be arrived at by balancing both the interests of justice and mercy.

RESPECTFULLY SUBMITTED,

THE DEFENDANT,
PATRICK CHELLEL

/s/ *Bruce D. Koffsky*
Bruce D. Koffsky

cc:    Nicholas Bradley, AUSA
       Kaiya Arroyo, AUSA
       Jennifer Ong, AUSA